NW Environmental Advocates Case, Consolidated Cases or Council Ready? And you've agreed among yourselves as to time distribution? Yes. Okay. Counsel? Good morning. May it please the Court, Jennifer Scheller representing EPA. I'm going to try to reserve 2 minutes of rebuttal time and also 5 minutes for Mr. Longstreth. Okay. The question before this Court is a narrow one. It's whether EPA acted arbitrarily or capriciously in denying NWEA's petition for rulemaking. And if it did, any remedy must be accordingly narrow. That assumes that we don't get at the ultra-various question. I mean, it sounds as though you're only addressing the question of the denial of the petition for rulemaking. Right. Because the challenge to the 1973 regulation is untimely. Right. So you've got to get us over that hump before you can say the question is as narrow as you just stated it. Yes. And as we explained in our briefs, this Court has original jurisdiction. And I'd like to, because of the limited time, focus on three questions. One is what claims are and are not timely. Two, whether EPA's denial of the petition for rulemaking was permissible. And third, I would like to make the point that if the denial was arbitrary or capricious, a September 2008 vacature deadline of the regulation is inappropriate, especially considering that we're talking about an expansion of the NPDES program that currently covers about 550,000 sources. Is EPA currently working on that? It is currently working. Meeting that deadline? It is working to meet that deadline and doing the best that it can. As we explained in the Hanlon declaration that was attached to the back of our reply brief, EPA is truncating some steps. It's foregoing looking, creating original data, doing those sorts of things. But it is trying to get permit coverage in place by September 2008, in case it cannot. It just finished a new Federal Register comment period about a week ago, trying to gather more information. And we're talking about adding to the NPDES program some 18 million new sources that are highly mobile, that have never been regulated before. And that is a huge undertaking for the agency, whenever you're talking about a program that currently only covers about 550,000 sources. So I'd like to move first to the timeliness question and whether or not review can be had of the original underlying regulation. The Clean Water Act, in that act, Congress provided that challenges to regulations like this one need to be brought within 120 days of a regulations promulgation. By that standard, a challenge to regulation that was promulgated in 1973 is clearly untimely. NWEA waited 30 years before coming to this court with a petition for review of that action. What NWEA can get at this point is review of EPA's denial of the petition for rulemaking. And that makes sense whenever you look at the big picture of what Congress was trying to accomplish. Are you assuming in this argument that we don't have, that the district judge did not have jurisdiction? That's correct. I'd be happy to answer any questions about that. I'm not sure I'm with you on that point. I think the district court might have had jurisdiction. Well, this court has original jurisdiction under two prongs of Section 509 of the Clean Water Act. One is subsection F, which is relating to permits. And this court has held on three separate occasions that review of regulatory exclusions that define the scope of the MPDS program and relate to those permits. That review is had initially in the courts of appeals, not in the district courts. Are you referring to that line of cases that follows from the Ginsburg decision, the D.C. Circuit? Yes. Now, as I read those cases, what was being reviewed there was not a total exclusion from regulation, but was rather, how do I want to say it, irregulations. This is to say regulations governing the promulgations of regulations. Isn't that right? In the original D.C. Circuit case, yes. But in the cases that were decided by this Court, those involved exclusions of specific sources or types of discharges from the MPDS program. And this Court asserted original jurisdiction over those charges. I'm not sure I read those cases in the same way. Our cases look to me very much like the D.C. Circuit case. Well, I think that if you look to, for instance, American Mining Congress, that was a challenge by industry saying that a regulatory exclusion for certain mines that had been remediated, that that should have been broader and should have included more mines that would be exempt from the MPDS permit requirement. That wasn't really about setting up regulations. That was literally which mines are going to require MPDS permits and which ones are not. That's the same thing that we're talking about here. And so I think under that precedent, this Court has original jurisdiction. And the other part of that is under subsection E of Section 509 of the Clean Water Act. This Court also has original jurisdiction over challenges to effluent limitations or other limitations. And as we explained in our briefs, there are several ways in which this regulation and the petition. Kagan. But that requires you to say that no limitation is a limitation because the regulation challenge here says we're not going to limit. But you're saying it is a limit for purposes of the jurisdiction. I don't know if you can get there from here. Well, the D.C. Circuit has addressed sort of a similar thing and said that whenever you're placing limitations on permit issuers, that that is also a limitation reviewable in the courts of appeals. And here there is a limitation on the permit issuers. It says, you know, you don't need to and you should not issue permits for these types of discharges, discharges incidental to the normal operation of a vessel. And it also establishes which discharges do and do not require permits. That is defining the scope of the MPDS program and is also should be reviewed initially in the courts of appeals. And, again, if you look at the big picture, what Congress was trying to accomplish was in this highly regulated world of MPDS permits where lots of people are relying on EPA's regulations, it wanted challenges to be brought in the courts of appeals and it wanted them to be brought promptly. And so I think that consistent with that, this challenge really belongs in the courts of appeals. To address briefly the timeliness issue, the Clean Water Act, again, requires these challenges, these regulations to be brought within 120 days. But even if the district court had jurisdiction, it still could not have reached the underlying regulation, because under this Court's precedent in Wind River, the only thing that's reviewable is the denial of the petition for rulemaking. This Court can look at that and see whether it was arbitrary capricious, but it cannot go back and get direct review, and that's also in line with the D.C. Circuit's case law on this issue, get direct review of that underlying regulation. So are you just skipping over the ultra-virus argument that we have jurisdiction because the wholesale exemption is contrary to the plain language of the CWA itself? No. Even in cases where there's an allegation that a regulation or other agency action is ultra-virus, you still can't get direct review of that underlying agency action. The only thing that can happen is there's this procedural device, which And then if you're making an ultra-virus allegation, you can get review of that denial of that petition for rulemaking or other action in the courts of appeals, but not direct review. How do you distinguish the Eleventh Circuit's Leaf case? The language in the Leaf case is certainly problematic, as you suggest, but I don't think that the Court was actually faced with, again, a direct challenge, a separate account to the underlying agency action in that decision. And so in that sense, I think it's perfectly consistent with Wind River. Correct me if I'm wrong, but my understanding is that the agency in the Leaf case said, we're simply not going to regulate in this area. The petitioners come in and say, we want you to regulate, and the suit is brought outside the six-year period. And the Leaf court says, well, this is an application as to them, and therefore, we can get at the underlying question, which is to say whether or not there's an obligation to regulate. Am I misdescribing Leaf? I think that Leaf, again, involved the same sort of procedural device of asking the agency to regulate, and then you get review of the denial of that petition to regulate, essentially. And so that's the same thing that's going on here. It still allows NWEA to give review. But my understanding of Leaf is, once the Court saw the case in that posture, it did not just review this under abuse of discretion as refusal to regulate. It reviewed the underlying ultraviolence question as a matter of law. I'm not sure that it did do that. That's not how I read the case. But even if it did, that's, of course, not binding on this Court, and that would be inconsistent with the Wind River approach. Well, that's the question. The next question is, is Leaf inconsistent with Wind River? If you read Leaf as the way Your Honor has suggested, then it probably does have to be, would be inconsistent with Wind River. But that is the binding precedent in this circuit. And I don't think that Leaf necessarily has to be read that way. The Court wasn't very careful in what it, whenever it was writing the opinion, I think, in describing what was being challenged and what it was reviewing. And so I don't think that it necessarily has to be read as inconsistent. On the merits, Congress has acquiesced in EPA's longstanding interpretation of the Clean Water Act in this instance. And that is evidenced by two types of congressional action. One is Congress has made clear in enacted legislation twice that it is aware of EPA's regulatory interpretation. It did that both in the National Defense Authorization Act for 1996, when it referred explicitly to the regulation. And it also did it in the Hard Mineral Resources Act of 1979, where Congress ratified the portion of the regulation that says the exemption does not apply to vessels that are engaged in recovery of resources. The second important thing that Congress has done is that in instances where it under this exemption, it has never asked EPA to regulate those discharges under the MPDS program. In each case, Congress has set up a new regulatory regime, much like we had in Brown and Williams and tobacco, and directed either EPA to administer it, but not under the MPDS program, or in a couple of very important cases, including the invasive species and ballast water context, it has directed the Coast Guard to administer the program. And it goes from there. Roberts. Let me stop you for just one second. Would you stop the clock for a minute? You wanted to reserve five for your colleague and five for rebuttal? Right. So I have two more minutes left. And you're under 10 minutes. No, I'm sorry. I just wanted to reserve two for myself for rebuttal. Oh, fine. Start it again. Okay. Just wanted to be sure. Thank you. I appreciate that. And so if I can talk just a little bit about ballast water, which is the issue that seems to have initially prompted this lawsuit and is what the agency thought was really being asked of it in the petition for review, Congress specifically said when it was faced with the problem of invasive species and ballast water, it instructed the Coast Guard, first I want you to institute voluntary guidelines on vessels. It doesn't apply to everyone. Then it said go ahead and make some of those mandatory. And then it said if certain criteria are met, all of the requirements should be mandatory throughout the country. Congress took a very deliberate approach to this problem, which is in tension or even inconsistent with the plaintiff's argument that the Clean Water Act prohibits all of these discharges barring an NPDES permit. And I think that that's pretty clear evidence that there is some ambiguity in the Clean Water Act that Congress was recognizing that EPA had the flexibility to act in this way. But, you know, in both those sort of ‑‑ both of those statutes, and specifically of ballast water and invasive species, both of those have saving clauses that preserve Clean Water Act regulation. So it's not quite clean that they just said, you know, whatever they say, we're doing this. They've saved out Clean Water Act stuff. That's true. But at the time those statutes were both enacted, the regulation was already in existence and Congress was acting against that backdrop. And certainly if Congress disagreed with the approach that EPA had taken, and if it thought that the appropriate regulatory tool was to issue individual NPDES permits to each of these vessels for the various discharges and various water bodies and various water qualities, all those sorts of things, it could have instructed EPA to go ahead and do that. But it didn't. It made a separate choice to regulate it under a different regime, which is very similar to what we had in Brown and Williamson, where you have a longstanding agency interpretation here, one that's been in existence for 30 years, and from mere months within the Clean Water Act's enactment. And now you are in Tier 7. I am. I just want to say one thing about remedy. If the Court reaches the question of what it should do, really the only agency action that's before this Court is the denial of the petition for rulemaking. If that was arbitrary and capricious, then it should be vacated and remanded to the agency to consider what to do with the petition, whether there are any alternate justifications. And certainly a vacature of the regulation is allowed. September 2008 is just not enough time. There are detailed declarations in the record explaining EPA's usual process and how long that normally takes. And when you're talking about expanding the program not just to the on the order of thousands of additional boats that have ballast water discharges, but the millions of recreational vessels, basically anything with an engine, because the regulation exempts discharges from properly functioning marine engines, that's a huge undertaking for EPA. It's an area they haven't regulated in before, and they should simply have more time to think about the problem. Okay. Thank you. Mr. Longstreth. Thank you, panel. And I would like to preserve Ms. Scheller's 2 minutes rebuttal time, so I'll try to stick to the, I guess I've got 345. I guess that would give me, because we don't like giving the agency. I'm John Longstreth. I'm with the K&L Gates Law Firm, representing the shipping industry ballast water coalition. It's 400 domestic carriers that carry a large portion of the domestic waterborne commerce of the United States. Eighty percent of all the import and export commerce of the United States is carried on vessels that would be affected by this ruling. And our concern, we agree with EPA on the merits, obviously, but our concern on the remedy, which is what I would like to focus most of my attention on, is that if we are not allowed to discharge ballast water, we cannot operate our vessels safely, and $800 billion worth of maritime commerce comes grinding to a halt. Ballast water has to be used and discharged in vessel operations where the ship risks breaking up and sinking. It's an absolutely necessary part of our operations. I don't think anybody wants all your ships up on the shore. Let me ask you this. Your brief states very persuasively that a lot of this is already regulated by Coast Guard regulations, so out on the ocean you're supposed to exchange and sort of pump out the bad stuff and only have just sort of regular old ocean water in and so on. Correct. It occurs to me to wonder that if the EPA isn't going to engage in rulemaking under the Clean Water Act, that a lot of the work has probably already been done for it by what the Coast Guard is doing. What additional regulation might you be worried about? Well, it seems to me that a lot of the problems are already being taken care of. Maybe there's some more problems, but nobody's asking you to come into port, empty it all out, leave port with no ballast water. That's not in the cards. Well, these plaintiffs say they are not asking for this, and these plaintiffs make a lot of statements as to EPA's flexibility. They can issue general permits, they can adopt the Coast Guard regulations as a first step. The problem we have with that is even if we take these plaintiffs at their word that they're not going to come back in September 2008 or whatever date, EPA issues the regulations and challenge their adoption of Coast Guard regulations. There are plenty of other plaintiffs out there. The standing in this case was somebody who was on a river and said he was disturbed by the fact that there were invasive species in the water. So we have a literally limitless supply of potential plaintiffs who can come in and say, no, the Coast Guard regulation is not enough. You're required to adopt technology-based standards, a different standard under the Clean Water Act, and the Clean Water Act does have a different standard. So we're open to the problem that if the exemption is vacated, EPA has already said, I think quite persuasively, that they're really concerned about being ready in time because of the unprecedented nature of all of this. We're going to be faced with lawsuits, maybe not from these plaintiffs, according to their representations, but from others, that additional regulation is required under the Clean Water Act, application of certain technologies that we don't believe have been accepted or proven to be effective or commercially available, other, you know, other technological fixes for this kind of thing that are not required by the Coast Guard. And that's the concern that we have. But if you're right, the EPA has proved fairly sympathetic to your concerns in the past. I doubt they would become immediately unsympathetic. Well, even if the EPA were not sympathetic, we're subject to citizen suits, and this is not a hypothetical problem. In June, we got noticed with it. But once the EPA actually engages in rulemaking and has a permitting process in place, at that point, the plaintiffs challenging that are in a radically different position. To say they've got to find abuse of discretion, all kinds of things. And if EPA has done its job carefully, you win. Boom. Well, we would hope so, but we're still, I think, and as I said, we've already been faced with citizen suits in another area. I think in the Great Lakes, they've sued about 20 companies, given notice of intent to sue, saying our discharges are unlawful. And that's the concern we have. We're going to be subject to that kind of uncertainty, particularly if you don't eliminate this vacatur of the regulation, give EPA this sort of hurry-up schedule where they're going to have to do something, quick fix, that is going to be, create uncertainty for us and legal exposure. And I'd like to reserve the rest of the time for Michelle. Roberts. All right. We'll hear from the Northwestern Environmental Advocates at this time. Ms. Powers. Thank you, Your Honors. Good morning, and may it please the Court. You're straight 15 and 5, right? That's right, Your Honor. Okay. My name is Melissa Powers, Counsel for Petitioners, Northwest Environmental Advocates, the Ocean Conservancy, and San Francisco Baykeeper. Timothy Hoffman from the New York Attorney General's Office is with me on behalf of the six Great Lakes states who are intervener appellees in this action. When he speaks after me, he will focus primarily on remedy, but I'm happy to answer any questions about remedy as well. Your Honors, in 1973, when EPA promulgated the vessel discharge exemption, it stated that it believed that this type of discharge generally causes little pollution. By the 1990s, it had become clear that EPA was, quite frankly, very wrong about its estimates of pollution from vessels. Accordingly, in January 1999, petitioners and several other conservation groups petitioned EPA to rescind its vessel discharge exemption on the basis that it was causing enormous ecological harm and on the basis that it was facially contrary to the Clean Water Act. EPA denied that petition in September 2003, and petitioners timely challenged within 120 days that denial, both in this Court and the District Court. In timely challenging the denial, petitioners have also timely challenged the regulation itself. As this Court explained in Wind River Mining Corporation v. United States, when a challenger wishes to contest the substance of an agency's action as exceeding constitutional or statutory authority, the challenger may do so by challenging the application of that unlawful agency action to the particular challenger within six years of that application. That's precisely what the petitioners have done here, and it's precisely what the other courts, including the D.C. Circuit and the Eleventh Circuit, have allowed. Where we timely challenge an agency action that relies on a non-lawful regulation, the Court can reach both the application and the unlawful regulation. In reaching this regulation, Your Honors, the only answer to the merits is that the vessel discharge exemption is flatly contrary to the Clean Water Act. And it's not true. Can I go back to Wind River? I'm sorry. Certainly, Your Honor. I'm a little concerned that Wind River doesn't get quite as far as you need it to go if we're going to be reviewing. I've got to make my premises clear. If we assume the district court properly had jurisdiction and we're now on the question of the six-year statute of limitations applicable to the elder survivor's question, Wind River, as I understand it, is premised upon that D.C. Circuit Coleman case. The Coleman case is one in which there was a particular individual applying for monetary benefits for himself, which is a very specific kind of application. How do we get from there all the way to Leif? Well, Your Honor, the D.C. Sorry. The Wind River case was also based on the district or the D.C. Circuit's case in public citizen versus the Nuclear Regulatory Commission case. And in that case, public citizen challenged an agency regulation that was based in part on an earlier agency regulation. And the D.C. Circuit held that in challenging this later regulation, public citizen could also reach back to the prior regulation, a direct challenge to which would have been time barred. And in finding that public citizen could, in fact, reach back, the D.C. Circuit specifically noted that it would exercise jurisdiction over both regulations, because otherwise public citizen could simply have filed a petition with the agency, asked the agency to rescind the earlier regulation as being ultra-virus, and then filed a challenge to the agency's denial of that petition, challenging both the denial and the underlying regulation. So Wind River explicitly relied on the public citizen case, which explicitly set forward the path that petitioners here filed. And that's also why the Eleventh Circuit's decision in Leif versus EPA reaches the right result. And the underlying premise in this Court's decision in Wind River was that an agency should not be able to avoid judicial review forever over an ultra-virus regulation. This Court drew a clear distinction between challenges to agency actions that are based on procedural claims and policy claims, with challenges such as this that are alleging that an agency regulation is flatly contrary to law. And the basis for that distinction is that an agency's interest in finality over the procedural and policy-based claims outweighs the right to review after the statute of limitations. But where an agency is acting contrary to law and implementing rules that remain in effect and continue to have effect over the public, then the public in fact should be able to engage in the type of petitioning process in which they've engaged in here. Because an agency should not be allowed to maintain a regulation that is flatly contrary to the Clean Water Act. And that's exactly what this is. The Clean Water Act unambiguously prohibits any unpermitted addition of any pollutant into navigable waters from any point source, and it defines point source to expressly include any vessel or other floating craft. EPA's regulation, however, states that discharges incidental to the normal operation of a vessel do not need permits. And it's undisputed that as a result of this exemption, discharges of polluted ballast water, bilge water, gray water, and other pollutants are discharging into the United States waters without a permit. This regulation is flatly inconsistent with the Clean Water Act. I guess the argument on the other side that has the most appeal to me is the congressional acquiescence argument, because after all, this reg has been in effect for over 30 years, and Congress has enacted legislation in this field to deal with this problem. What is your response to that? Your Honor, Congress has not acquiesced to this regulation. EPA, in its brief, basically tries to craft two lines of congressional acquiescence arguments. Under one line, EPA argues that this satisfies the actual doctrine of congressional acquiescence, and then EPA argues that the Supreme Court has created a new doctrine of acquiescence in its FDA v. Brown v. Williamson decision. Under both scenarios, Congress has not acquiesced. First, under the true doctrine of congressional acquiescence, the Supreme Court made clear in United States v. Rapanos that an agency can demonstrate congressional acquiescence only where there is overwhelming evidence that Congress has acquiesced to the precise issue here.  It did, Your Honor. And actually, Congress has expressed exclusion of discharges incidental to the normal operation of vessels of the armed forces, in fact, forecloses EPA's argument that Congress also silently acquiesced to this broader exemption. As the Supreme Court stated in United States v. Smith, where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied in the absence of a contrary legislative intent. The only thing in the legislative history that EPA has pointed to and that we have found is that Congress referenced the vessel discharge exemption here, and then chose to carve out a much more limited exemption for military vessels specifically. Congress never in the legislative history signaled its approval of this exemption. And what this Court said this year in Morales-Cisquiero v. Gonzalez is that this is very clear that Congress has considered and approved of an agency's practice. There is no indicia of approval. In fact, this is just like in the solid waste agency of Northern Cook County case out of the Supreme Court, where the Supreme Court found that the agency's citing to some legislative history showing congressional recognition certainly did not meet the standard for congressional acquiescence. Can you help me? I'm having trouble distinguishing this case and your argument from Brown v. Williamson. Your Honor, Brown v. Williamson was an entirely different case. And at the outset, I would note that the arguments that EPA makes here are nearly identical to the arguments that EPA made before the Supreme Court in the Massachusetts v. EPA case decided in April of this year. EPA argued that Congress's enactment of later legislation that addressed climate change through various bills somehow signaled Congress's intent to override the Clean Air Act's regulation of carbon dioxide and other greenhouse gases as air pollutants. And the Supreme Court said that these later congressional enactments, just as here, do not demonstrate congressional intent to override the operative law. In fact, all of these laws can complement each other. And the Clean Water Act, in fact, provides the actual tool for allowing these laws to complement each other. Section 402G of the Clean Water Act in the NFTIS program states that where EPA issues a NFTIS program for vessels or permit for vessels, those permits shall incorporate Coast Guard regulations relating to the transport and stowage of pollutants. So the Coast Guard regulations, in fact, can be incorporated into the NFTIS permit as Congress anticipated. Let me ask you this now that we've got the Coast Guard regulations on the table. What do you want as a practical matter in addition to what's already being required by the Coast Guard? Your Honor, at the outset, this, at its heart, is the fact that the Clean Water Act mandates regulation through the NFTIS program of vessel discharges. And EPA's exemption prohibits regulation through the NFTIS program of vessel discharges. So our desire at the outset is established by Congress's mandate in the Clean Water Act. Moreover, Your Honor Your Honor, that's not my question. My question is a practical one. What practical matter do you want that is different from what's already being accomplished under the Coast Guard regulations? Your Honor, the record reflects that the Coast Guard regulations as currently implemented are not adequate. In fact, the declarations submitted to the district court by the EPA demonstrate that the ballast water exchange regime that the Coast Guard has implemented is not sufficient. The record shows that if you exchange up to 95 percent of the water in a ballast tank, you could kill only between 20 to maybe 90 percent of the species. And with invasive species at issue here, Your Honors, once invasive species, even in very low levels, enter a water body, they can colonize very quickly and rapidly take over an ecosystem. In the San Francisco Bay I see. So you're just saying this is not enough. It's not enough, Your Honor. And then the arguments we're getting about all the other sort of land-based technologies which can work on land won't work on seagoing vessels. I guess that's an argument you say we'll hash that out when we get in front of the EPA at rulemaking? That's right, Your Honor. And as Mr. Hoffman will explain in greater detail, the beauty of the NIFTIS permit program is the level of flexibility that it provides for the regulated community, for the regulators in terms of crafting the initial NIFTIS program. But at the flip side, the whole purpose of the Clean Water Act was to be a technology-forcing statute. Every five years, the permits are supposed to be revised. Every three years, effluent limitations are supposed to be reconsidered. And the idea, as manifested in Congress's ultimate zero-discharge goal, is that technology, in fact, would bring us to a point where water pollution would not be the problem that it is in this country. But so long as the NIFTIS program is shelved, as it is under this exemption, we will never even begin the process of seeing the Clean Water Act's program put into place. EPA's own website identifies the effluent limitation program as its most successful environmental program. But unless we get a permit system in place, we will never have the successes that EPA has achieved for these types of very harmful pollutants, Your Honors. Turning back very briefly, if I could, to the congressional acquiescence argument and the FDA versus Brown and Williamson, in Massachusetts versus EPA, the Supreme Court foreclosed the argument that FDA versus Brown and Williamson creates this wholly new doctrine of congressional acquiescence. It made clear that FDA versus Brown and Williamson applied to those limited circumstances in which there were really irreconcilable conflicts between the underlying law and the later enactments. In Brown and Williamson, regulation under the Food, Drug, and Cosmetic Act would have necessitated a ban on tobacco products. Yet Congress had repeatedly and emphatically stated that tobacco products should not, in fact, be banned. Also, in FDA versus Brown and Williamson, there were repeated and multiple, over a course of decades, references to the fact that FDA had repeatedly stated that it lacked regulatory authority, and Congress had, in fact, relied on those statements in enacting later legislation. There is nothing in the records underlying the National Invasive Species Act, the Act to Prevent Pollution from Ships, signaling that Congress relied on EPA's vessel discharge exemption in creating these other laws. NISA specifically states that that law shall not affect or supersede requirements pertaining to the discharge of ballast water into waters in the United States under the Clean Water Act. It's difficult to imagine, if EP was right, that Congress was preserving the Clean Water Act with an exemption in place when the preservation would mean nothing at all. And then the Act to Prevent Pollution from Ships similarly states that the remedies of that act supplement and neither amend nor repeal any other provision in law. So unlike in FDA versus Brown and Williamson, where Congress, in fact, was acting on the basis that there was no underlying law, in these later laws, Congress, in fact, preserved the Clean Water Act. So there cannot be a finding of congressional acquiescence here, and certainly there is absolutely no overwhelming evidence that EPA has presented to meet that standard. Very briefly, Your Honors, I would note that in this case, because this regulation is ultra-virus, flatly contrary to the statute, the proper remedy in this case is to set it aside or invalidate it. This is mandated under the Administrative Procedure Act, which directs courts to set aside agency action that's contrary to law, and it is also consistent with Supreme Court precedent and this Court's own precedent. Do you have any quarrel with Judge Elston setting a time, setting aside but as of an effective date in the future? No, Your Honor. In fact, during the district court proceedings, the plaintiffs and the Petitioner appellees here specifically asked the court to delay the vacature to provide the agency with an amount of time to respond, and ideally to put into place something so that the ballast water shipping industry's concerns about having no permit whatsoever would be remedied. So we think that the district court clearly set the right remedy, and it certainly was not an abuse of discretion. Do you want to save time for Mr. Hoffman? Yes, Your Honors. Thank you very much. Thank you. Mr. Hoffman. May it please the Court, Tim Hoffman from the New York Attorney General's Office on behalf of New York, Illinois, Michigan, Minnesota, Wisconsin, and Pennsylvania. Your Honors, the States are in great need of the district court's timely remedy in this case. Invasive species are damaging ecosystems like the Great Lakes, like San Francisco Bay. They're causing irreparable harm and damaging the integrity of those ecosystems, which is what the Clean Water Act is designed to protect. The district court's injunction we think should be affirmed for three reasons. It secures the prompt compliance with the Clean Water Act. That was the measure that the Supreme Court in Weinberger set for the district court's discretion to act to remedy Clean Water Act violations. Second, it properly vacates agency action that is devoid of any statutory authority. And finally, it responds to this ongoing environmental harm in a balanced way that is, again, well within the court's discretion. Your Honors, the Clean Water Act requires pollution controls that improve over time. And those kind of controls don't even begin to happen without the permit system. The overarching principle of the Act is that no one has the right to pollute. All pollutant discharges require permits. The EPA vessel exemption disables the Act. Congress made the permit system key to creating a uniform national floor of pollution control. EPA established standards were intended to become a uniform minimum pollution protections across the country. Permits would translate those standards into obligations for similar discharges across the country, dischargers. The exemption prevents those kind of minimally protective standards from ever being set, let alone improved upon over time. The exemption forecloses the uniform ratcheting down of pollution that is the hallmark of the Clean Water Act. Vacating it lets the statute work again, as Congress intended. Vacating the exemption is the right legal remedy. As Ms. Powers alluded to, EPA has no authority to exempt point source discharges from the NPDES program. That is sub-law. I just am a little concerned and was, and listened sympathetically to the argument that if we get this far to affirming the district judge and get to the question of remedy, that this is a pretty complicated affair. And while the EPA has not shown itself in a hurry to regulate, to state that mildly, and nonetheless hesitate to have a deadline that says September 2008, hell or high water, let's have your regulation, whether you're, whether in the exercise of your sort of conscientious, conscientiously performed duty that you've now been informed of, you may not be ready. Your Honor, we believe that the district court's selection of that date was reasonable for a number of reasons. The court considered first the fact of the irreparable harm. We have a type of pollution that actually reproduces and colonizes ecosystems. So it's literally a problem that grows over time. But more than that, the district court considered the fact that EPA has been working with the Coast Guard for years on technology controls for that most very harmful kind of discharge, the invasive species discharges from approximately 8,000 trans-oceanic vessels nationwide. EPA has never said it could not meet that date. What they've said is that they would need to gather information differently. The district court's two-year timeframe is consistent with EPA's own estimate in its 2001 report of what it would take to revise the NIPTES program. And in this supplemental handling declaration that's attached to their reply brief, they acknowledge that, indeed, they came up with a multistate stormwater discharge program in less time than if you measure it from the court's liability order until the September 08 date. But more than that, Your Honor, the Clean Water Act provides a number of flexible administrative devices to – I see that my time is out. May I finish? Ginsburg. Finish your sentence. Okay. General permitting is not only something this Court is well familiar with, but in the NIPTES, they need only comply with – all they need to do is adhere to the terms of the permit. They don't even need to submit a notice of intent. So there are a great many flexibilities. That is the beauty of the Clean Water Act. Congress made the decision a long time ago. Pollution control first. Administrative feasibility can be worked out. Thank you, counsel. Thank you. Rebuttal. Could you put two minutes on the clock? Thank you, Your Honor. I just have a few quick points. Sorry. I see 325. Two. Put two minutes on. Does she have 325 left? Just make it two minutes. Sorry for the delay. That's okay. Thank you for the time. Keep that thought ready. Okay. Okay. Go. On the statute of limitations question, I just want to make the point that under NWEA's reading of the case law, it would essentially eliminate the statute of limitations. There would be no statute of limitations because it could always be avoided in every case by the procedural device that they used. But only with respect to acts that are alleged to be ultra-virus. Right. Sorry. I forgot about that piece of it. But as the D.C. Circuit explained in National Mining Association versus DOI, that sort of elimination of the statute of limitations constraint, even in allegations that the action was ultra-virus, is really important whenever you have Congress talking in very specific language and setting strict deadlines and saying that challenges, any challenges beyond that period must be based on new information, which is not the case that we have here. So I would urge this Court to not directly review the underlying regulation. On the merits question. Can I just ask, so we, so under, because they filed, you agree that they filed a timely petition for review in our court? Of the denial of the petition for rulemaking. Right. So we have jurisdiction of that without any question at all. Right. We did not challenge. And so we could, even if we agreed with you on all, on the jurisdiction of the district court, we could do the same thing that the district court did and enact the same, same remedy asserting our own jurisdiction. If this Court only has jurisdiction over, and we think it does, over the denial of the petition for rulemaking, the appropriate remedy is to vacate the agency action under review, which is EPA's denial of the petition for rulemaking. Send it back to the agency, allow it to consider whether there are any other rationales, which is the district court recognized some of that denial might be justified under a de minimis understanding, and allow the agency to, you know, perhaps deny in part the petition for rulemaking again. And that's the appropriate rule for courts. That's what Congress has set out in the APA and also in the Clean Water Act. What's to prevent us if we agree with you that we have direct review from the EPA, that it was wrongly sent to the district court, and that the only question in front of us is the review of the denial to engage rulemaking? What's to prevent us in reviewing that question from saying that the original 1970s exemption was ultraviolence? What is preventing this Court from doing that is under basic administrative law principles, the Court looks at the articulation provided by the agency, and its role is to say whether or not that was arbitrary or capricious, the justification case. We say that. We conclude that it's arbitrary and capricious because the denial of rulemaking is premised upon the 1970s order having been within the authority of the agency, but because we think it's ultraviolence, they've simply mistaken the question of law, and therefore it's per se an exercise, excuse me, an abuse of discretion. I don't think that this Court on this record can say that, because there is the possibility that some of these discharges, for instance, the heat coming off of marine engines, most marine engines, in fact, I think all of them are water-cooled, but heat is a pollutant under the Clean Water Act. EPA might decide that that heat coming off of a certain class of boats, say jet skis, that's a de minimis source of pollution and therefore doesn't require an MPDS permit. EPA should have the opportunity to justify parts of the regulation based on those alternate-type theories on remand, and the regulation should not be vacated. Kennedy, but what if we were to say, okay, you can exercise discretion in various ways, but we want to tell you that to the degree that your order denying rulemaking was premised on the idea that you had the authority to entirely exclude this category of behavior in rulemaking, that was ultraviolence? This Court can say that, but what it should not do is to say, well, what's the advantage for you then of our engaging in that level of review rather than going through the district court? I don't get it. The advantage is a very practical one, which is that if you send back and tell the agency, okay, look at the petition for rulemaking again, you know what the Ninth Circuit's holding is, you know that you can't rely on the congressional acquiescence-type arguments, then the agency can, if it wants to, deny part of the petition, say, okay, well, we will repeal the regulation as it applies to ballast water, but we're not going to repeal it as it applies to these other things, because there are other justifications for leaving the regulation in place. And it doesn't have to then go through the new notice of comment rulemaking. But how can you do that consistent with the plain terms of the Clean Water Act? EPA would, of course, have to make the record and would have to show, for instance, the suggestion has been that some of these discharges might be de minimis and therefore don't require NPDES permits. And there is some case law out there suggesting that that might be a possible justification. And if EPA developed the record on that issue and looked at the various discharges, then perhaps EPA could come to that conclusion. Our questions are taking you well over your time. You want one quick wrap-up? I just want to say that I think ultimately the question is that Congress has shown over the years, acting against the background of EPA's longstanding regulation, that it is acquiesced in what EPA thinks the Clean Water Act means and this Court should uphold the denial of the petition for rulemaking. Thank you. Roberts. Thank both sides for their arguments. A very interesting case. We appreciate your briefs and effort. And the case just argued will be submitted for decision. Court stands in recess. All rise. This Court is adjourned. The stand is in recess.
judges: Hawkins,wardlaw, W. Fletcher